## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER T. BARNETT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00053 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **LINDA S. MCMAHON,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:    Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I will vacate the final decision of the Commissioner denying benefits, and I will remand this case to the Commissioner for further development.

### I. Background and Standard of Review

Plaintiff, Christopher T. Barnett, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2006).  Jurisdiction of this court is pursuant to 42 U.S.C.

---

[1]Linda S. McMahon became the Acting Commissioner of Social Security on January 20, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 2:05-cv-00053-PMS   Document 17   Filed 02/23/07   Page 1 of 21   Pageid#: 109

§§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Barnett filed his initial applications for DIB and SSI on or about May 24, 2000,[2] alleging disability as of May 4, 2000,[3] based on a back disorder with numbness in his left leg. (Record, ("R."), at 166-70, 191, 827-31.) His claims were denied initially and upon reconsideration. (R. at 120-22, 123, 125-26, 835-36.) Barnett then requested a hearing before an administrative law judge, ("ALJ"). (R. at 127.) An initial hearing was held on May 17, 2001, at which Barnett was represented by counsel. (R. at 44-49.) This initial hearing was continued to allow

---

[2]Barnett filed subsequent applications for DIB and SSI on November 27, 2001, which were consolidated with his earlier applications. (R. at 22, 149, 181-83, 837-39.)

[3]Barnett's original application alleged disability as of June 21, 1999. (R. at 166.) Barnett later amended his application to allege disability as of May 4, 2000, based on his working until this date. (R. 170, 831.)

additional medical evidence to be gathered and submitted. (R. at 47.) A second hearing was held on September 20, 2001, at which Barnett was again represented by counsel. (R. at 50-70.) By decision dated October 26, 2001, the ALJ denied Barnett's claims.[4] (R. at 148.) Barnett filed a request for review, and the Appeals Council vacated the ALJ's decision and remanded Barnett's case to the ALJ for further review of his alleged mental impairments. (R. at 148-50.) A third hearing was held on April 2, 2003, at which Barnett wasonce again represented by counsel. (R. at 71-109.)

By decision dated April 11, 2003, the ALJ again denied Barnett's DIB and SSI claims. (R. at 22-38.) The ALJ found that Barnett met the insured status requirements of the Act for DIB purposes and was insured for benefits through the date of his decision. (R. at 37.) The ALJ found that Barnett had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 37.) The ALJ also found that the medical evidence established that Barnett had severe impairments, namely obesity and degenerative disc disease, but the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32, 37.) The ALJ found that Barnett's allegations regarding his limitations were not totally credible. (R. at 37.) The ALJ found that Barnett had the residual functional capacity to perform a full range of light work.[5] (R. at 37.) The ALJ further found that Barnett could return to his past relevant work as a security guard and computer technician. (R. at 38.) Thus, the ALJ found that Barnett was not under a disability, as defined in the Act, and was not entitled to benefits. (R.

---

[4]The ALJ's October 26, 2001, opinion is not included in the record before the court.

[5]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

at 38.)  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

After the ALJ issued his opinion, Barnett  pursued his administrative appeals, (R. at 18), but the Appeals Council denied his request for review.  (R. at 12-15.) Barnett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006).  The case is before this court on the Commissioner's motion for summary judgment filed April 4, 2006, and Barnett's motion for summary judgment filed March 8, 2006.

## *II. Facts*

Barnett was born in 1971, (R. at 166), which classifies him as a younger person under 20 C.F.R. §§  404.1563(c), 416.963(c).  He completed the eleventh grade and subsequently received his general equivalency development diploma, ("GED"). (R. at 197.) Barnett has past relevant work experience as a cook and manager of a pizza restaurant, a computer technician and a security guard. (R. at 192.)

At his April 2, 2003, hearing, Barnett testified that he suffered from chronic back and left leg pain. (R. at 76-77.)  Barnett stated that his left leg often went numb causing him to fall. (R. at 77.)  Barnett stated that he used a walker to prevent further falls. (R. at 78.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. S. W. Bland, M.D.; Norton Community Hospital; Lonesome Pine Hospital; Dr. S. S. Tholpady, M.D.; Wise County Behavioral Health Services; Dr.

Mark M. Taylor, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Ranjy Basa, M.D.; Dr. Karl W. Konrad, Ph.D., M.D.; Hugh Tenison, Ph.D., a state agency psychologist; Dr. F. Joseph Duckwall, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; St. Mary's Hospital; Dr. Donald R. Williams, M.D., a state agency physician; Foxglove Services; Dr. Michael Hartman, M.D., a state agency physician; Robert S. Spangler, Ed.D., a licensed psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. G. S. Kanwal, M.D.; Dr. Mark E. Shaffrey, M.D.; The Laurels; Big Stone Gap Pharmacy; Primary Care Pharmacy; CVS Pharmacy; Dana Claunch, Psy.D, a licensed clinical psychologist; Virginia Health Services Center; and Frontier Health.

Barnett suffered a lumbosacral strain at work on January 15, 1997, when he slipped off of a walkway and twisted his back. (R. at 249.) Barnett again suffered a lumbar strain at work on June 21, 1999. (R. at 258.) Barnett was seen in the Norton Community Hospital emergency room that day with a complaint that he had felt something pop in his back. (R. at 254.) Barnett was diagnosed with a lumbar strain and was prescribed Percocet. (R. at 254.)

Dr. Kevin Blackwell, D.O., began treating Barnett in June 1999. On June 23, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 15 pounds and could not push or pull items weighing more than 20 pounds. (R. at 252.) He also stated that Barnett could not perform repetitive motions or bending. (R. at 252.) Dr. Blackwell prescribed physical therapy. (R. at 260.) On July 7, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 25 pounds and could not push or pull items weighing more than 30 pounds. (R. at 252.) He also

stated that Barnett could not perform repetitive motions. (R. at 252.)

On August 3, 1999, Barnett presented to Wellmont Lonesome Pine Hospital complaining of back pain. (R. at 262.) Barnett was diagnosed with left sciatica, was given injections of Nubain, Vistaril and Norflex and was discharged to follow up with his family doctor the next day. (R. at 262.) On August 5, 1999, Barnett saw Dr. S. S. Tholpady, M.D., with complaints of back pain. (R. at 267.) Dr. Tholpady diagnosed lower back pain due to lifting and left sciatica and prescribed Darvocet. (R. at 267.) On October 6, 1999, an MRI was performed on Barnett's lumbar spine. (R. at 276.) The MRI revealed a small left paracentral disc protrusion at the L5-S1 level. (R. at 276.)

On October 20, 1999, Dr. Blackwell stated that Barnett complained of a back pain rating of a nine on a 10-point scale on some days. (R. at 275.) Barnett also complained of pain radiating into his left leg on a daily basis. (R. at 275.) Dr. Blackwell noted that Barnett's straight leg raises were negative, and his deep tendon reflexes were within normal limits. (R. at 275.) Dr. Blackwell noted that he reviewed an MRI which showed a left paracentral disc protusion at the L5-S1 level. (R. at 275.) Dr. Blackwell ordered an EMG to evaluate Barnett's leg pain. (R. at 275.) Dr. Blackwell released Barnett to his regular work activities, but he instructed him not to drive or operate machinery while taking his pain medication. (R. at 275.)

On November 1, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 15 pounds and could not push or pull items weighing more than 25 pounds. (R. at 251.) He also stated that Barnett could not perform repetitive

-6-

motions or bending, but he stated that Barnett could return to work without restrictions on November 10, 1999. (R. at 251.) Barnett returned to Dr. Blackwell on November 16, 1999. (R. at 273.) Barnett reported that he had coughed and felt an excruciating pain in his lower back which had resulted in difficulty walking. (R. at 273.) Dr. Blackwell noted that Barnett's L5-S1 area was tender with palpation, but it appeared to him that the tenderness was exaggerated. (R. at 273.) Dr. Blackwell stated that Barnett's straight leg raises were negative for pain below the knee. (R. at 273.) His note also states that: "Neurosensory is intact." (R. at 273.) Dr. Blackwell restricted Barnett to lifting and pushing and pulling items weighing 15 pounds or less, with no repetitive bending or lifting. (R. at 273.)

Barnett saw Dr. Blackwell again on December 1, 1999. (R. at 272.) On that date, Dr. Blackwell noted that Barnett had begun using a cane because he complained of his left leg giving out. (R. at 272.) Dr. Blackwell noted that Barnett's straight leg raises were negative, and his deep tendon reflexes were within normal limits. (R. at 272.) He again stated: "Neurosensory is intact." (R. at 272.) On January 12, 2000, Dr. Blackwell ordered an epidural steroid injection, which was performed by Dr. David Nauss, M.D., at Norton Community Hospital on January 17, 2000. (R. at 271, 277-78.) On February 22, 2000, Dr. Blackwell stated that Barnett could not lift items weighing greater than 30 pounds or push or pull objects weighing more than 35 pounds. (R. at 250.) Dr. Blackwell continued to treat Barnett through November 8, 2000, with little if any change in his condition. (R. at 268-71, 431-33.) None of Dr. Blackwell's notes make any mention of complaints of any psychological symptoms such as depression or anxiety.

-7-

On May 5, 2000, Barnett was treated at Lonesome Pine Hospital for a broken right hand. (R. at 279-83.) Barnett also has been treated for a number of falls, including a fall on February 17, 2000, a fall on October 29, 2000, and falls on November 5, 7, 9 and 14, 2000, May 16, 2001, August 25, 2001, January 23, 2002, January 30, 2002, May 31, 2002, July 2, 2002, and August 21, 22 and 29 2002. (R. at 284-89, 397-99, 405-13, 415-23, 425-28, 485-91, 517-22, 573, 606-11, 624-28, 635-41, 663, 667-73, 777-802.) These falls have resulted in multiple facial lacerations and lacerations and injuries to Barnett's arms and hands. (R. at 397-99, 405-13, 415-21, 485-90, 606-11, 624-28, 640, 777-97. ) The medical records note that at least three of these falls were directly related to Barnett's leg giving out, back pain or a loss of balance. (R. at 406, 519, 797.) He also was treated at Lonesome Pine Hospital emergency room for an exacerbation of back pain on May 29, 2001, April 4, 2002, May 9, 2002, June 30, 2002, and July 27, 2002. (R. at 523-28, 618-23, 629-34, 642-46, 647.)

On July 19, 2000, Dr. Donald R. Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment stating that, based on his review of the evidence, Barnett could occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 25 pounds. (R. at 293-301.)

On July 23, 2000, Barnett was admitted to Lonesome Pine Hospital with complaints of chest pain. (R. at 303-05.) He was discharged on July 28, 2000, with a diagnosis of atypical and noncardiac chest pain. (R. at 302.)

The first mention of any psychological complaints by Barnett were noted by Dr.

Mark M. Taylor, M.D., when he examined Barnett on August 18, 2000. (R. at 364.) Dr. Taylor noted that Barnett was positive for depression and stress. (R. at 364.) Dr. Taylor prescribed Effexor and Sonata. (R. at 364.) On August 24, 2000, Barnett complained that the Effexor was not working, so Dr. Taylor discontinued it and prescribed Klonopin and Paxil. (R. at 363.) While Dr. Taylor's notes reflect conversations between his staff and Barnett, it does not appear that he saw Barnett again until April 11, 2001. (R. at 459.) On April 17, 2001, Dr. Taylor completed an assessment stating that Barnett's mental work-related abilities were seriously limited or worse in all categories except for a satisfactory ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 456-58.) Dr. Taylor last saw Barnett on December 10, 2001. (R. at 571.)

On October 18, 2000, Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment stating that, based on his review of the evidence, Barnett could occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 25 pounds. (R. at 365-72.) Dr. Hartman also stated that Barnett should be able to perform work that did not require heavy lifting. (R. at 371.)

Also on October 18, 2000, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 373-87.) Tenison stated that Barnett suffered from a severe mental impairment that was not expected to last 12 months and which did not meet or equal a listed impairment. (R. at 373.) Tenison noted that Barnett had no restrictions of activities of daily living and had not

experienced any repeated episodes of decompensation of extended duration. (R. at 383.) Tenison stated that Barnett had mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. (R. at 383.) Tenison also stated that Barnett's condition would be expected to improve with treatment. (R. at 385.) Tenison stated that Barnett's activities were not significantly restricted due to a psychiatric impairment. (R. at 387.) Tenison also stated that Barnett's condition did not preclude all work activity. (R. at 387.)

Robert S. Spangler, Ed.D., a licensed psychologist, performed a consultative evaluation on Barnett on October 25, 2000, at this attorney's request. (R. at 388-94.) Spangler noted that Barnett seemed socially confident but depressed and anxious. (R. at 388.) Spangler stated that Barnett demonstrated erratic concentration but was appropriately persistent on the assessment tasks. (R. at 388.) Spangler noted that Barnett was alert and oriented. (R. at 390.) Barnett complained of suicidal ideations and auditory hallucinations, including hearing bells and voices. (R. at 390.) Spangler performed intelligence testing, but stated that the results were not valid. (R. at 391.)

Barnett told Spangler that he suffered from chronic back pain due to a work-related injury. (R. at 389.) It is important to note that Barnett incorrectly told Spangler that he suffered a heart attack on July 23, 2000, which had led to chronic chest pain. (R. at 389.) On November 6, 2000, Spangler completed an assessment of Barnett's work-related abilities, which states that Barnett had a limited but satisfactory ability to maintain personal appearance and a seriously limited or no ability to perform all other occupational, performance and personal/social adjustments. (R. at 395-96.)

-10-

Spangler diagnosed Barnett as suffering from a major depressive disorder, recurrent, severe with suicidal and auditory hallucinations, an anxiety disorder, not otherwise specified, mild to moderate, and low average intelligence. (R. at 391.)

On November 17, 2000, Barnett voluntarily admitted himself to The Laurels for detoxification. (R. at 477-82.) Barnett reported that he had begun to experience hallucinations after taking Prednisone prescribed for him by one of his physicians. (R. at 479.) Barnett was diagnosed with suffering from opioid abuse and was discharged after five days with no aftercare treatment. (R. at 479.) According to the notes provided, Barnett reported that he did not believe that he had a substance abuse problem. (R. at 479.) Barnett's then-current Global Assessment of Functioning, ("GAF"), score was assessed at 65. (R. at 479.)[6]

Dr. Mark E. Shaffrey, M.D., with the University of Virginia Health System Department of Neurological Surgery, examined Barnett on January 8, 2001. (R. at 473.) Dr. Shaffrey found that Barnett's back was minimally tender to palpation, but he found no significant evidence of muscle spasm. (R. at 473.) Dr. Shaffrey noted that Barnett's strength in his legs was normal with some pain limitation in the left leg which did not follow a radicular pattern. (R. at 473.) He found Barnett's muscle tone, sensation and reflexes to be normal. (R. at 473.) Dr. Shaffrey noted that an MRI performed in 1999 had revealed a small left L5-S1 disc protrusion, which did not

_____

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-11-

appear to affect the nerve root. (R. at 473.) Dr. Shaffrey ordered a lumbar CT scan with myelogram. (R. at 473.) On June 19, 2001, Dr. Shaffrey reported that the CT scan with myelogram showed a left paracentral disc protusion which was adjacent to the S1 nerve root with "no significant mass effect." (R. at 492.) Dr. Shaffrey stated that he saw no need for surgical intervention and recommended continuing conservative treatment. (R. at 492.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a consultative psychological evaluation on Barnett at the request of the state agency on January 13, 2001. (R. at 434-40.) Lanthorn noted that Barnett did not appear to be in any psychological distress on the date of the evaluation. (R. at 434.) Barnett was alert and coherent and answered questions readily. (R. at 434.) Barnett complained of suffering from anxiety. (R. at 435.) Barnett also reported that he had been treated at The Laurels for detoxification from some type of steroid medication, which he claimed made him "crazy." (R. at 435.) Barnett complained of trouble falling and staying asleep and that he had been nervous for the previous year-and-a-half. (R. at 437.)

Based on testing, Lanthorn estimated that Barnett's intellectual functioning level fell in the borderline to low average range. (R. at 439.) Lanthorn diagnosed Barnett with a dysthymic disorder, late onset (mild), alcohol and cannabis dependence in sustained full remission by self-report and borderline intellectual functioning. (R. at 439.) Lanthorn placed Barnett's then-current GAF score at 65 to 70. (R. at 439.) Lanthorn stated that, while it appeared that Barnett suffered from depression, his symptoms of depression were not significantly limiting. (R. at 440.) Instead, Lanthorn

-12-

stated that much of Barnett's difficulties appeared to be due to his physical complaints. (R. at 440.) Lanthorn also completed an assessment of Barnett's work-related abilities which stated that Barnett had a satisfactory or better ability to make all occupational, performance and personal/social adjustments. (R. at 441-42.)

On January 17, 2001, Dr. Karl W. Konrad, Ph.D., M.D., performed a consultative examination on Barnett at the request of the state agency. (R. at 443-45.) Barnett complained of back pain radiating into his left leg. (R. at 443.) Dr. Konrad's examination revealed a full range of motion in all of Barnett's joints. (R. at 444.) Dr. Konrad observed no tenderness or spasm in Barnett's back. (R. at 444.) Dr. Konrad noted some muscle wasting in the left thigh. (R. at 444.) Dr. Konrad noted that Barnett's reflexes were normal and symmetrical. (R. at 444.) Dr. Konrad diagnosed a limited range of motion of Barnett's lumbar spine with normal x-rays. (R. at 445.)

Dr. Konrad also completed an assessment of Barnett's work-related abilities which stated that he could occasionally lift items weighing up to 30 pounds and frequently lift items weighing up to 20 pounds. (R. at 446-48.) Dr. Konrad stated that standing and walking was not affected by Barnett's impairment. (R. at 446.) Dr. Konrad stated that Barnett could sit for up to six hours in an eight-hour workday, but could do so for only 30 minutes without interruption. (R. at 447.) Dr. Konrad also stated that Barnett's ability to push and pull was limited. (R. at 447.)

On November 11, 2001, Barnett was admitted into Lonesome Pine Hospital for an overnight stay for treatment of his recently diagnosed diabetes. (R. at 576.)

-13-

On January 3, 2002, Dr. Richard M. Surrusco, M.D., a state agency physician, completed an assessment of Barnett's work-related activities. (R. at 681-90.) Dr. Surrusco stated that Barnett could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R.at 682.) Dr. Surrusco noted no other limitations on Barnett's work-related abilities.

Barnett began mental health treatment with Frontier Health, Inc., through the Wise County Counseling Center on January 11, 2002. (R. at 546-58.) Barnett complained of suffering from a depressed mood since June 1999. (R. at 546.) Barnett also reported that he had attempted suicide in 2000 due to an allergic reaction to some medication he was taking. (R. at 546.) On July 29, 2002, Eric T. Greene, a licensed professional counselor, noted that Barnett appeared to be physically uncomfortable and his mood appeared to be depressed. (R. at 534.) Greene stated that Barnett appeared to be in a grief/loss pattern associated with his physical injury. (R. at 534.) On September 13, 2002, James Kegley, M.S., recommended that Barnett begin participating in the Life Changes group therapy as part of his treatment goals. (R. at 748.) It does not appear that Barnett ever complied with this treatment option. (R. at 740-47.)

Barnett began treatment with Dr. Ranjy Basa, M.D., and Carol Looney, F.N.P., at Stone Mountain Health Services on March 11, 2002. (R. at 705.) Barnett complained of depression and multiple problems. (R. at 705.) On April 26, 2002, Barnett saw Looney for complaints of pain in the left chest and shoulder. (R. at 702.) It appears that Dr. Basa and Looney have primarily provided prescriptions for Barnett's medications. On November 7, 2002, Barnett complained of chronic back

-14-

pain and left leg weakness. (R. at 753.) Dr. Basa's note reflects that Barnett was walking with the aid of a walker. (R. at 753.)

On June 13, 2002, Dr. Basa completed an assessment of Barnett's mental work-related abilities. (R. at 694-96.) Dr. Basa stated that Barnett's abilities were seriously limited or worse in every area except for a satisfactory ability to understand, remember and carry out complex job instructions and to maintain personal appearance and a more than satisfactory ability to follow work rules and to understand, remember and carry out detailed and simple job instructions. (R. at 694-95.) Dr. Basa also noted that Barnett had not provided him with medical records documenting his continuing treatment for chronic back pain, nor had he provided Dr. Basa with any records from his mental health counseling. (R.at 695-96.) Dr. Basa also noted that Barnett had not followed medication instructions. (R. at 695.)

On February 13, 2003, Dr. Basa noted that Barnett's depression was doing well on Zoloft. (R. at 818.) On March 21, 2003, Dr. Basa completed an assessment of Barnett's work-related abilities on which he stated that Barnett could occasionally and frequently lift items weighing less than 10 pounds. (R. at 822-25.) Dr. Basa stated that Barnett could stand or walk for less than two hours in an eight-hour workday and sit for less than six hours. (R. at 822-23.) Dr. Basa stated that Barnett's abilities to push and pull with his upper extremities and to reach were limited, and that he could never climb, balance, kneel, crouch, crawl or stoop. (R.at 823-24.) He also noted that Barnett's exposure to temperature extremes, vibration and hazards should be limited. (R. at 825.)

-15-

Dr. Konrad evaluated Barnett again on April 3, 2002. (R. at 708-10.) Dr. Konrad found no tenderness or muscle spasms in Barnett's back, but reported a limited range of motion of the lumbar spine. (R. at 709-10.) Dr. Konrad noted that Barnett had normal muscle tone and strength in his lower extremities, as well as normal reflexes. (R. at 709.)

Hugh Tenison, Ph.D., a state agency psychologist, completed another PRTF on Barnett's condition on May 8, 2002. (R. at 711-26.) Tenison stated that Barnett did not suffer from a severe mental impairment. (R. at 711.) Tenison stated that there was insufficient evidence from which to determine whether Barnett experienced any restriction of activities of daily living or any difficulties in maintaining social functioning. (R. at 723.) Tenison stated that Barnett experienced mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 723.)

Dr. F. Joseph Duckwall, M.D., a state agency physician, completed an assessment of Barnett's work-related abilities on May 22, 2002. (R. at 727-37.) Dr. Duckwall stated that Barnett could occasionally lift items weighing up to 20 pounds and could frequently lift items weighing up to 10 pounds. (R. at 728.) He found that Barnett could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 732.) Dr. Duckwall placed no other restrictions on Barnett's work activities.

Lanthorn performed another consultative psychological evaluation on Barnett at the request of the state agency on January 4, 2003. (R. at 804-14.) Lanthorn noted that Barnett walked with the aid of a walker, but he did not appear to be in any

psychological stress on the date of the evaluation. (R. at 804.) Barnett stated that he suffered from chronic back pain and problems with his left leg going numb causing him to fall. (R. at 805.) Barnett was rational, coherent and alert and was able to concentrate and attend to the task at hand. (R. at 807.)

The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was performed, and Barnett received a verbal IQ score of 73, a performance IQ score of 72 and a full-scale IQ score of 70, placing him in the boderline range of intellectual functioning. (R. at 808.) The Miller Forensic Assessment of Symptoms Test, ("M-FAST"), also was administered, and Barnett's scores suggested that he might be malingering or exaggerating his psychological symptoms. (R. at 809-10.)

Lanthorn diagnosed Barnett as suffering from a dysthymic disorder, late-onset, and borderline intellectual functioning. (R. at 810.) He placed Barnett's then-current GAF score at 65. (R. at 810.) Lanthorn stated that Barnett was displaying symptoms of depression, but that these symptoms did not appear to be significant. (R. at 810.) Lanthorn also completed an assessment of Barnett's work-related mental abilities on which he stated that Barnett had a satisfactory or better ability in all areas. (R. at 812-14.)

The record also includes an undated "Diagnostic Synthesis" by Dana P. Claunch, Psy.D., a licensed clinical psychologist. (R. at 501-03.) It appears that Claunch's report was prepared as a result of a review of the medical evidence of record and not based on an evaluation of Barnett. In large part, it simply summarizes the medical evidence provided for review. Claunch did state that:

-17-

A physiological disorder that is a direct result of psychological conflict is apparent and appears to exert a controlling influence on Mr. Barnett's interaction with other people. Introversion, somatization, and depression are characteristic symptoms. Mr. Barnett likely has developed a symptom picture in allowance for avoidance. ... The continuing complaints of chronic pain may be more accurately diagnosed as depression.

(R. at 502.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 11, 2003, the ALJ denied Barnett's DIB and SSI claims. (R. at 22-38.) The ALJ found that Barnett met the insured status requirements of the Act for DIB purposes and was insured for benefits through the date of his decision. (R. at 37.) The ALJ found that Barnett had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 37.) The ALJ also found that the medical evidence established that Barnett had severe impairments, namely obesity and degenerative disc disease, but the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32, 37.) The ALJ found that Barnett's allegations regarding his limitations were not totally credible. (R. at 37.) The ALJ found that Barnett had the residual functional capacity to perform a full range of light work. (R. at 37.) The ALJ further found that Barnett could return to his past relevant work as a security guard and computer technician. (R. at 38.) Thus, the ALJ found that Barnett was not under a disability, as defined in the Act, and was not entitled to benefits. (R. at 38.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006).

In his brief, Barnett argues that the ALJ's decision was not based on substantial evidence of record. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 8-19.) In particular, Barnett argues that the ALJ erred in finding that his condition did not meet or equal the listed impairment for disorders

-19-

of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A). (Plaintiff's Brief at 17-19.) Barnett also argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Basa, his treating physician. (Plaintiff's Brief at 12-16.) Barnett further argues that the ALJ erred by finding that he did not suffer from a severe nonexertional impairment. (Plaintiff's Brief at 8-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Based on my review of the record, I find that substantial evidence does not support the ALJ's finding, but for none of the reasons argued by Barnett. In his opinion, the ALJ specifically rejects Barnett's subjective complaints to the extent alleged. (R. at 36.) In particular, the ALJ rejects Barnett's allegations that he has become unstable when he walks and needs the assistance of a cane or walker. (R. at 36.) In rejecting these allegations, the ALJ does not address the medical evidence that Barnett suffered from falls on at least 15 different occasions from February 2000 through August 2002, many of which resulted in serious injuries to his face, hands and arms. In fact, there is no mention of these incidents in the ALJ's decision other than

where the decision states: "The record documents that the claimant has been treated at a hospital emergency room on multiple occasions. However, physical examination did not reveal any significant findings." (R. at 32.) The ALJ also makes no mention of this evidence in his rejection of the medical opinions which placed restrictions on Barnett's ability to stand and walk.

That being the case, I cannot determine whether the ALJ properly considered this evidence in determining Barnett's residual functional capacity. Therefore, I find that substantial evidence does not exist to support the ALJ's finding on this issue or his determination that Barnett was not disabled.

## IV. Conclusion

For the foregoing reasons, the Commissioner's and Barnett's motions for summary judgment will be denied, the Commissioner's decision to deny benefits will be vacated, and this case will be remanded to the Commissioner for further development.

An appropriate order will be entered.

DATED:      This 23rd day of February 2007.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE